FINDLAW (HTTPS://LP.FINDLAW.COM/) / CASELAW (HTTPS://CASELAW.FINDLAW.COM/) / OREGON (HTTPS://CASELAW.FINDLAW.COM/COURTS/OREGON) / OR SUPREME CT. (HTTPS://CASELAW.FINDLAW.COM/COURT/OR-SUPREME-COURT) / IN RE: COMPLAINT AS TO THE CONDUCT OF LEONARD D. DUBOFF

# IN RE: Complaint as to the Conduct of Leonard D. DUBOFF (2023)

Print    Font size: A A Reset

## Supreme Court of Oregon.

### IN RE: Complaint as to the Conduct of Leonard D. DUBOFF, OSB #774378, Respondent.

(SC S069006)

Decided: February 16, 2023

Before Flynn, Chief Justice, Duncan, Nelson, Garrett, and DeHoog, Justices, and Balmer and Walters, Senior Judges, Justices pro tempore.* David J. Elkanich, Buchalter, P.C., Portland, argued the cause and filed the briefs for respondent. Also on the briefs was Amber Bevacqua-Lynott. Eric Collins, Assistant Disciplinary Counsel, Tigard, argued the cause and filed the brief for the Oregon State Bar.

In this lawyer disciplinary proceeding, respondent Leonard D. DuBoff challenges the conclusion of a trial panel of the Disciplinary Board that respondent had violated Oregon Rule of Professional Conduct (RPC) 1.8(a), which restricts a lawyer from entering into "a business transaction with a client" unless the lawyer satisfies multiple conditions meant to protect the client from the possibility of overreaching. The trial panel determined that respondent had violated that rule by failing to disclose in writing essential terms of a transaction under which respondent's clients agreed to pay some or all of what they owed for legal services by providing "construction services" to respondent and his law firm. We agree with the trial panel that respondent violated RPC 1.8(a) in that way and that a public reprimand is the appropriate sanction for that violation.

I. BACKGROUND

Respondent has been a member of the Oregon State Bar since 1977. He describes his practice as focused on business law, art law, international law, copyright and trademark law, high-tech law, and publishing and entertainment law. Around 1999, respondent's law firm began representing Mr. Leascu and Mrs. Leascu and their construction company, Dependable Home Remodeling, Inc. For many years, the relationship was that of lawyer and clients, with respondent representing the clients on a variety of legal matters and the clients paying respondent's charges for those legal services. That changed around November 2014, when respondent started hiring the clients to perform construction projects on properties that he owned. Around the same time, the clients' need for legal services began to substantially increase, and they accumulated a large outstanding balance for those legal services.

At some point, the clients proposed that they could work off their accruing legal fees by performing additional construction projects for respondent, and respondent agreed to the proposal. As respondent described at the disciplinary hearing, he and Mr. Leascu agreed that respondent "would pay for out-of-pocket expenses" on the construction projects but that Mr. Leascu's "labor, his employees' labor, [and] independent contractors' labor" on the projects "would be used to offset the legal fees" that the clients owed to respondent's firm.

The agreement was in effect at least by July 2015, when respondent emailed a letter to the clients with the subject line "In[-]Kind Payments for Legal Services." The letter "confirm[ed]":

"We have now agreed that you will pay some or all of the amounts you owe, or will owe in the future, to The DuBoff Law Group with construction services including but not limited to carpentry, electrical, plumbing, painting, and the like, instead of by paying with money."

The letter then explained:

EXHIBIT "3"

"Oregon ethical rules consider such an in[-]kind payment arrangement to be a business transaction between the law firm and [the] client. The DuBoff Law Group will not be representing you in this business transaction.

"The Duboff Law Group will continue to calculate its billings based on its then-standard hourly rate and will credit you for the in[-]kind payments based on your rates for the work you perform. You will provide this firm with a 1099 form for the value of these in[-]kind payments."

The letter went on to describe potential risks to the arrangement, including that respondent's "interests in this transaction could at some point be different than or adverse to" those of the clients. "Specifically," the letter advised, there was a possibility that respondent's firm and the clients "may disagree as to the value of the in[-]kind payments, or a dispute may arise over how a refund will [be] made if necessary."

The clients signed and dated the letter under a statement that read, "I hereby consent to the legal representation, the terms of the business transaction, and the lawyer's role in [the] transaction as set forth in this letter."

For the next two years, the clients worked on multiple projects for various residential and commercial properties that respondent or his family members owned, including: numerous projects at an address in Portland where respondent's son and his family lived; a complete remodel of the Portland home where respondent's daughter lived; six projects at respondent's Portland home; several projects at two cabins that respondent owned in Nehalem; and a renovation of a property that respondent intended to sell. In addition, for nearly a year, Mr. Leascu took on the job of performing landscaping work twice a month at respondent's personal residence, and he handled tasks like snow-removal and emergency repairs at two office parks in which respondent had an interest.

Although Oregon law requires a written contract for residential construction projects exceeding $2,000, ORS 701.305, and although many of the projects for respondent significantly exceeded $2,000, the clients performed the work that respondent requested without written contracts or contract proposals.[1] Instead, the record suggests that the projects were identified by respondent and conveyed to the clients in emails with instructions such as the following: "I have another project that I will need to have you assist with"; "[b]elow is the complete list of things which need to be done at [respondent's son's] house"; or "[b]elow is a list of items that need to be taken care of at Mr. and Mrs. DuBoff[s'] cabin and residence."

Throughout the years of this arrangement, the clients sent invoices totaling more than $300,000 for the clients' costs on the various projects, and respondent paid the invoices. Mr. Leascu testified, however, that the invoices included only his costs for labor and materials for the job. They did not include charges for his time and his wife's time on the project, because Mr. Leascu understood that those charges would be offset against legal fees. Mr. Leascu also did not charge respondent for things like bringing equipment and trailers to the job—things that he considered to be "overhead." And Mr. Leascu did not include charges for profit on the jobs.

For reasons that are not apparent from the record, however, the clients never submitted an accounting of the services that they understood could be credited against their legal fees. And respondent never asked for documentation of those services until 2017, when he became dissatisfied with the clients' construction services. In a June 2017 email to the clients, respondent demanded that the clients provide documentation for all of their work on the projects and emphasized his frustration with their failure to provide the documentation:

"The agreement we had was that, when doing any contractor work for us, you would charge us for the actual 'out of pocket' cost of materials and we would pay for those materials. You also agreed that you would keep track of the time you, your employees and any independent contractors worked on our jobs and provide a description of the work performed as well as letting me know how much time was spent on each job and what the total labor costs for that job [were] as well."

Respondent's email insisted that the clients "were supposed to provide those descriptions, times and prices on a regular basis" but "never did." The email concluded that respondent was "very disappointed" in the way that the clients had conducted themselves and that his firm would be withdrawing from all representation of the clients, their family, and all the family businesses. Respondent had given the clients no credit against accrued fees for the work that they had performed on his properties, and he demanded that the clients pay their outstanding bill—which exceeded $175,000—"immediately."

Respondent eventually filed a lawsuit against the clients on behalf of himself, several family members, and two business entities that respondent owns. The complaint alleged negligence, negligence per se, fraud, conversion, nuisance, breach of contract, and unlawful trade practices, and it sought almost $1,000,000 in damages.[2] At the suggestion of the clients' new counsel, the Leascus sent a letter to the Bar's Client Assistance Office describing their experience with respondent.

After an investigation, the Bar charged respondent with one violation of RPC 1.8(a). That rule provides:

"(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

"(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

"(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

"(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction."

At the trial panel proceeding, respondent argued that RPC 1.8(a) did not apply to his agreement with the clients regarding construction services, because that agreement was not a "business transaction" under the rule. Alternatively, respondent argued that, if the agreement came within the scope of the rule, then the letter that he had sent in July 2015, which the clients signed, satisfied the requirements of RPC 1.8(a).

The trial panel disagreed. It determined that respondent had entered into a "business transaction" with his clients and that respondent had failed to satisfy several of the requirements that RPC 1.8(a) imposes on a lawyer's business transaction with a client. It concluded, therefore, that respondent had violated RPC 1.8(a) and that a public reprimand was the appropriate sanction for that violation.[3]

II. DISCUSSION

In this court, respondent reprises his argument that his arrangement with the clients was not a "business transaction" for purposes of RPC 1.8(a). Alternatively, respondent argues that, if the arrangement was subject to RPC 1.8(a), then the court should find that the July 2015 letter that respondent sent the clients complied with the requirements of that rule. We review the trial panel's decision de novo and determine whether the Bar established by clear and convincing evidence that respondent violated RPC 1.8(a). See BR 10.6 (providing for de novo review); BR 5.2 (requiring proof by clear and convincing evidence).

RPC 1.8 sets out numerous specific rules governing circumstances that create a conflict of interest between a lawyer and current clients. As explained above, paragraph (a) is the requirement at issue in this case. For convenience, we again set out the text of the rule:

"(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

"(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

"(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

"(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction."

This court has previously explained that RPC 1.8(a) was modeled on the American Bar Association's Model Rule of Professional Responsibility 1.8(a), and we therefore looked to the commentary to the Model Rule as "persuasive in interpreting the meaning of" RPC 1.8(a). In re Spencer, 355 Or. 679, 685-86, 330 P.3d 538 (2014). Relying on that commentary, we concluded in Spencer that—like the Model Rule—RPC 1.8(a) "protects clients from 'the possibility of overreaching when the lawyer participates in a business, property or financial transaction with the client.'" Id. at 688, 330 P.3d 538 (quoting and citing ABA Model Rules, Rule 1.8 comment [1] (2007)). Also like the Model Rule, we concluded, RPC 1.8(a) is violated whenever the lawyer enters into a business transaction with a current client "without first providing the advice that that rule requires and obtaining the necessary consent." Id. at 686, 330 P.3d 538.

A. "Business Transaction"

The first question that we must resolve is whether the arrangement between respondent and the clients was a "business transaction" for purposes of RPC 1.8(a). The term "business transaction" is not defined in the rules, and this court has not previously considered whether an arrangement like the one in this case is a "business transaction" subject to RPC 1.8(a). But the text of the rule and the interpretive guidance that our decision in Spencer supplies explain why the rule reaches the arrangement at issue in this case.

Restatement (Third) of the Law Governing Lawyers § 126 comment c (2000). The Restatement describes "standard commercial transactions" as "those regularly entered into between the client and the general public, typically in which the terms and conditions are the same for all customers." Id.

According to respondent, when he first began hiring the clients to perform construction projects for him—what respondent calls "Phase 1"—the arrangement was a "standard commercial transaction," because the clients performed construction services that they "generally marketed to others" and for which respondent paid "just as any other customer would."

We need not decide whether respondent entered into a "standard commercial transaction" when he first hired the clients to complete a construction project, because the arrangement that respondent describes as "Phase 2"—the period when he agreed to provide a credit against the client's legal fees for portions of the construction projects that the clients agreed to perform—was not a "standard commercial transaction." Although the clients were in the business of performing construction projects, the terms and conditions on which they offered their construction services to respondent differed significantly from the terms and conditions on which they regularly offered construction services to the general public. Mr. Leascu testified that they typically used a contract proposal that described the total cost of a construction project. He described the parts of a project as including not only the out-of-pocket cost for labor and materials but also charges for Mr. Leascu's work on the job as well as "overhead" charges for bringing equipment and trailers. For the projects that respondent asked them to perform, however, the clients offered construction services on a different and customized basis: they carved out the portion of each project that represented out-of-pocket costs, which respondent paid directly; they omitted from invoices the value of their own work on the project, because respondent had agreed to pay for that work with a credit against legal fees; and they omitted from the invoices charges for overhead and profit, for which there is no indication that respondent intended to pay. There is no evidence that the clients ever offered construction services to the general public without charging for overhead and profit, and there is no evidence that the clients ever offered their labor as a stand-alone service on any terms. As respondent apparently recognized when he sent his July 2015 letter—the "Phase 2" arrangement was a "business transaction" governed by RPC 1.8(a).

Respondent also argues, alternatively, that the arrangement after July 2015 was simply a "modification" of his original fee agreement with the clients, and thus—according to respondent—not subject to RPC 1.8(a). That argument relies on another distinction that we identified in Spencer. We explained that the Oregon Rules of Professional Conduct regulate an agreement to provide legal services "differently from other business transactions," emphasizing RPC 1.1, which "requires that a lawyer provide competent legal representation to his or her client"; RPC 1.2, which "governs when a lawyer can limit the scope of legal representation"; RPC 1.4, which "requires that a lawyer keep clients reasonably informed about certain matters regarding the legal representation"; and RPC 1.5, which "regulates the fees that a lawyer can charge a client for engaging in legal representation." 355 Or. at 687, 330 P.3d 538. And, therefore, we concluded that "RPC 1.8(a) does not apply to agreements to provide legal services but it does apply to other business transactions." Id.

But Spencer addressed only "agreements to provide legal services," and the July 2015 letter was not an agreement to provide legal services. The letter does not describe any legal work that respondent was agreeing to perform for the clients or describe any fees that respondent intended to charge for legal work—apart from indicating that respondent's firm "will continue to calculate its billings based on its then-standard hourly rate."

Moreover, Spencer's conclusion that fee agreements are regulated "differently from other business transactions," flowed from the premise that such agreements are separately regulated under the rules governing the lawyer's legal representation and the fees that the lawyer can charge. 355 Or. at 687, 330 P.3d 538. That reasoning and conclusion would extend to a "modified fee agreement" only if the modified agreement also is governed by the rules that regulate the lawyer's legal representation or the fees that the lawyer can charge. But respondent has offered no persuasive reason to conclude that the construction services agreement in this case, which did not modify respondent's legal representation or the fees that he would charge for that representation, should be understood as a modified fee agreement that would be regulated by RPC 1.1, 1.2, 1.4, or 1.5—rather than as a "business transaction" under RPC 1.8(a).

Instead, the record reflects that respondent and the clients had multiple fee agreements covering different categories of legal work that respondent had agreed to perform for the clients. And the July 2015 letter does not modify the legal work that respondent had agreed to perform under any of those prior fee agreements. Nor does it modify the rate that respondent would charge for those services. In fact, it does not identify any other term of any of the prior fee agreements that is being modified. Rather, the letter describes a parallel agreement under which the clients would have the opportunity to "pay some or all of the amounts" that they owed to respondent's firm—or would owe in the future—

by performing construction services. Although that parallel agreement no doubt related to respondent's agreements to provide legal services, we held in Spencer that RPC 1.8(a) reaches "business transactions" that are related to a fee agreement. 355 Or. at 688, 330 P.3d 538.

Respondent acknowledges that some agreements related to the payment of a legal fee can be subject to RPC 1.8(a). But he asserts that the rule applies only when the lawyer acquires an ownership, possessory, security, or other pecuniary interest in the client's business as a result of the modification—which respondent contends is not what happened here. Nothing in the text of the rule, our discussion in Spencer, or the ABA commentary on which that case relied supports that limitation, however. Rather, the rule prohibits a lawyer from either entering into "a business transaction with a client or" knowingly acquiring a "pecuniary interest adverse to a client" without "first providing the advice that that rule requires and obtaining the necessary consent." RPC 1.8(a) (emphasis added); Spencer, 355 Or. at 686, 330 P.3d 538.

We emphasize that RPC 1.8(a) does not preclude business transactions between lawyers and clients. Rather, it permits them so long as the rule's prophylactic requirements are met. See Spencer, 355 Or. at 686, 330 P.3d 538 (explaining that RPC 1.8(a) "serves as a general prophylactic against lawyers entering into business transactions with clients"). Through those requirements, the rule protects the lawyer's client against " 'the possibility of overreaching when the lawyer participates in a business, property or financial transaction with the client.' "[6] Id. at 688, 330 P.3d 538 (quoting and citing ABA Model Rules, Rule 1.8, comment [1]). As we emphasized in Spencer, the commentary to the Model Rule explains that the rule "disfavors an arrangement in which the lawyer has an 'advantage in dealing with the client.' " Id. at 685, 330 P.3d 538 (quoting ABA Model Rule, Rule 1.8, comment [1]). And "[t]he commentary does not suggest that, for the 'business transaction' prohibition to apply, the lawyer and client must have differing or adverse interests." Id.; see also Restatement § 126 comment b (explaining that "a lawyer who engages in a business transaction with a client is in a position to arrange the form of the transaction or give legal advice to protect the lawyer's interests rather than advancing the client's interests"). We rely on that commentary as "persuasive in interpreting the meaning of" RPC 1.8(a), because Oregon's rule was modeled on the ABA rule. See Spencer, 355 Or. at 686, 330 P.3d 538.

Thus, both the text and purpose of RPC 1.8(a) persuade us that it covers respondent's transaction with the clients. Here, the parties agreed that the clients would perform construction projects for respondent and customized how respondent would compensate the clients for those projects: they agreed that respondent would pay directly only for the client's out-of-pocket costs, they agreed that the clients could seek a credit from respondent's firm for the portion of the cost of the projects attributable to the clients' personal labor, and they reached no agreement on a mechanism for the clients to receive overhead or profit for the projects. There is no evidence that the clients offered their construction business services to the general public on those terms. And that customized arrangement made it the kind of transaction that allowed the possibility of overreaching given the lawyer's position of advantage. We therefore hold that the arrangement between respondent and the clients was a "business transaction" for purposes of RPC 1.8(a).

B.   The Requirements for Entering into a "Business Transaction"

Having concluded that respondent's arrangement with the clients was a "business transaction" within the meaning of RPC 1.8(a), we now consider whether respondent satisfied the requirements for entering into that business transaction. As pertinent to our resolution of this case, the requirements in RPC 1.8(a) for entering into a "business transaction" include that

"the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;"

and that

"the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction ***."

The Bar argues that respondent failed to meet the requirements of RPC 1.8(a) in multiple ways, but we address only one: Respondent's letter did not fully disclose the "essential terms" of the business transaction. We agree with the Bar that the July 2015 letter failed to set out terms that were essential to the transaction, and, for that reason, we conclude that the transaction violated RPC 1.8(a).

When evaluating conflicts of interest, this court has required strict adherence to the terms of the conflict-of-interest rules. See In re Lawrence, 332 Or. 502, 512, 31 P.3d 1078 (2001) (explaining that the lawyer violated former DR 5-101(A)(1), which required "full disclosure," in writing, of a conflict of interest, and rejecting the lawyer's argument that he had complied with the "spirit" of the rule by taking various actions to protect the client's interests); In re Leuenberger, 337 Or. 183, 212-13, 93 P.3d 786 (2004) (concluding that the lawyer violated former DR 5-101(A)(1) when he failed to advise the client to seek independent legal advice, notwithstanding that the lawyer had notified the client

orally and in writing of potential conflict of interest). In In re Brandt/Griffin, 331 Or. 113, 124-25, 10 P.3d 906 (2000), for example, two lawyers sent a disclosure letter to a client in an effort to comply with former DR 5-101(A), regarding a waiver of a potential personal conflict of interest. This court determined that the content of the letter was insufficient to show the nature and extent of the potential divergence of the lawyers' and the client's interests. Id. at 136, 10 P.3d 906. And this court concluded that the lawyers had violated the rule, even though the client had obtained independent legal advice about the conflict. Id. at 136-37, 10 P.3d 906. In so concluding, this court's focus was on the sufficiency of the writing and not on the client's subjective understanding of the conflict of interest. Id. at 137, 10 P.3d 906.

As set out above, RPC 1.8(a) requires that the lawyer "fully disclose[ ]" the terms of the transaction in writing "in a manner that can be reasonably understood by the client" and obtain the client's "informed consent * * * to the essential terms of the transaction." RPC 1.8(a)(1), (3). Although the multiple subparagraphs of the rule use different phrasing to describe the required disclosure, we understand the related subparagraphs, in combination, to mean that the terms are "fully disclosed" in writing when the writing sets out the "essential terms of the transaction," to which the clients must give "informed consent." We thus look solely to the writing that respondent has proffered—his July 2015 letter to the clients—to determine whether it contained the essential terms of the transaction.[7]

In pertinent part, the July 2015 letter provided:

"This letter confirms that we have now agreed that you will pay some or all of the amounts you owe, or will owe in the future, to The Duboff Law Group with construction services including but not limited to carpentry, electrical, plumbing, painting, and the like, instead of by paying with money.

"Oregon ethical rules consider such an in[-]kind payment arrangement to be a business transaction between the law firm and [the] client. The DuBoff Law Group will not be representing you in this business transaction.

"The Duboff Law Group will continue to calculate its billings based on its then-standard hourly rate and will credit you for the in[-]kind payments based on your rates for the work you perform. You will provide this firm with a 1099 form for the value of these in[-]kind payments."

Respondent argues that there was no ambiguity in any of the terms in the writing and that the clients were not confused about the description of the services they were to provide in exchange for a credit against their legal fees. Respondent points out that Mr. Leascu had been in the construction industry for decades and argues that he would have fully understood what was meant by the part of the letter stating that the clients would pay their legal bill with "construction services" rather than with money. Respondent also points to testimony from Mrs. Leascu that she understood that she and her husband "would do repair, remodeling work and [that Mr. Leascu's] work would be credited toward the bills." Finally, respondent emphasizes that he advised the clients to "consider the situation carefully," recommended that they consult with another lawyer, and obtained their written consent to the agreement.

But the letter nonetheless omits other terms that we conclude were essential to this business transaction. For example, the letter does not specify how the parties would determine what construction projects the clients would perform, for whom, when they would be performed, or—most significantly—how respondent would calculate the amount of credit that he would provide to the clients for their services. Instead, the letter sets out only that the credit will be "based on your rates for the work you perform," which does not describe how the clients would calculate those "rates" and whether the credit would include other standard costs on a construction project, such as overhead, equipment usage or profits. The failure to specify how the client's credit would be determined is a particularly significant omission given that respondent recognized at the time of his letter that there was a risk that the clients and the firm might in the future "disagree as to the value of the in[-]kind payments."

In addition, the July 2015 letter fails to disclose other terms that respondent himself considered to be essential to the arrangement, such as which out-of-pocket costs he would pay and what documentation he would require from the clients. For instance, when respondent eventually wrote to the clients to explain that he was terminating his representation of them, he emphasized:

"The agreement we had was that, when doing any contractor work for us, you would charge us for the actual 'out of pocket' cost of materials and we would pay for those materials. You also agreed that you would keep track of the time you, your employees and any independent contractors worked on our jobs ***."

And later, in testimony before the trial panel, respondent emphasized that he intended the clients to exclude costs for labor performed by the client's employees and independent contractors from the "out of pocket" costs for which respondent would pay:

"Well, the essential terms are I would—my wife and I would pay for out-of-pocket expenses for equipment and materials. [Mr. Leascu] would list his labor, his employees' labor, independent contractors' labor; and that would be used to offset the legal fees he owed my firm."

The July 2015 letter does not describe that limitation on the out-of-pocket costs for which respondent intended to pay.

Respondent's termination letter to the clients also includes references to terms that were not included in the July 2015 letter. For example, the termination letter states that the clients had agreed to "provide a description of the work performed as well as letting [respondent] know how much time was spent on each job and what the total labor costs for that job" were. It also states that the clients "were supposed to provide those descriptions, times and prices on a regular basis." Yet the July 2015 letter contains no mention of those reporting requirements that respondent believed were essential conditions of the clients obtaining a credit.

Given those omissions, we are persuaded that the July 2015 letter failed to "fully disclose[ ]" the "essential terms" of the transaction by which the clients agreed to provide construction services in exchange for a credit against their legal fees. And respondent has identified no other writing that disclosed those terms. Thus, respondent's business transaction with the clients violated RPC 1.8(a).

C.  Summary

We reiterate that RPC 1.8(a) serves as a "general prophylactic," Spencer, 355 Or. at 686, 330 P.3d 538; it does not prevent lawyers from agreeing to accept services from their clients in payment for legal fees, but it protects against the possibility of overreaching that arises with such transactions by requiring that the terms must be fair to the client and fully disclosed. As we have explained above, respondent's arrangement with his clients was a business transaction subject to the prophylactic requirements of RPC 1.8(a), and the July 2015 letter that respondent sent to the clients—purporting to comply with the requirements of that rule—failed to disclose essential terms of the transaction. We therefore agree with the trial panel that the Bar has proven by clear and convincing evidence that respondent violated RPC 1.8(a).

D.  Sanction

Both parties have agreed that, if this court concludes that respondent violated RPC 1.8(a) as alleged, then a public reprimand would be the appropriate sanction. We agree that a public reprimand is the appropriate sanction under the circumstances of this case, but a detailed explanation of that conclusion would not benefit the bench or the Bar. We therefore impose a public reprimand.

Respondent is publicly reprimanded.

FOOTNOTES

1.  ORS 701.305(1) provides in pertinent part: "A contractor may not perform work to construct, improve or repair a residential structure or zero-lot-line dwelling for a property owner without a written contract if the aggregate contract price exceeds $2,000."

2.  Respondent's civil action against the clients was pending in Multnomah County Circuit Court, but abated, at the time that the trial panel heard this disciplinary case.

3.  The attorney member of the trial panel dissented. The dissenting panel member noted that, in respondent's testimony before the trial panel, respondent himself seemed to concede that his arrangement with the clients was a business transaction for purposes of RPC 1.8(a) and, therefore, that the clients' informed written consent was required. For that reason, in the dissent's view, the only issue before the trial panel was whether the July 2015 letter was sufficient to satisfy the requirements of the rule. And, the dissenting panel member stated, he would have concluded that the July letter did satisfy the requirements of the rule.

4.  We need not decide whether a "business transaction" under RPC 1.8(a) must always involve an activity that the client—or lawyer—customarily engages in as a means of livelihood.

5.  Arguably, respondent and the clients engaged in a series of transactions—a new transaction each time respondent asked the clients to perform construction services that they then performed. But the parties have treated the entire relationship as a single transaction that either was or was not subject to RPC 1.8(a), and we accept that framing.

6.  During oral argument, respondent urged us to refrain from construing RPC 1.8(a) in a way that would extend the rule's reach to transactions in which a client that regularly offers goods or services to the public at a standard retail price offers those same goods or services to a lawyer in exchange for a credit toward legal fees in the amount of the

standard retail price. But that hypothetical exchange does not describe the transaction in this case, and we leave for another day the question of whether such an in-kind exchange tied to the standard retail price for a client's goods or services would present the possibility of overreaching that the "business transaction" limit of RPC 1.8(a) is intended to address.

7. As set out in the facts, there is evidence in the record suggesting that the parties began operating under the arrangement well before respondent sent the written disclosure of terms in July. If that timing is accurate, then that fact alone would establish a violation of RPC 1.8(a). However, respondent disputes that evidence, and we need not resolve the factual issue of when the clients first performed construction services for which they billed respondent only for out-of-pocket costs, given our conclusion that the July 15 letter does not satisfy the requirements of RPC 1.8(a).

PER CURIAM

BACK TO TOP

FindLaw®

Questions?
At FindLaw.com, we pride ourselves on being the number one source of free legal information and resources on the web. Contact us. (https://www.findlaw.com/company/contact-us/contacts.html)

Stay up-to-date with how the law affects your life. Sign up for our consumer newsletter.

ENTER YOUR EMAIL ADDRESS

(https://www.youtube.com/watch?v=WQiNbzaZOhw)

ABOUT US > (https://www.findlaw.com/company.html)

Our Team (https://www.findlaw.com/company/our-team.html)

Accessibility (https://www.findlaw.com/company/our-commitment-to-accessibility.html)

Contact Us (https://www.findlaw.com/company/contact-us/contacts.html)

FIND A LAWYER > (https://lawyers.findlaw.com/)

By Location (https://lawyers.findlaw.com/lawyer/state.jsp)

By Legal Issue (https://lawyers.findlaw.com/lawyer/practice.jsp)

By Lawyer Profiles (https://lawyers.findlaw.com/profile/profiles/lawyer/a/1.html)

By Name (https://lawyers.findlaw.com/lawyer/lawyer_dir/search/jsp/name_search.jsp)

SELF-HELP RESOURCES

Legal Forms & Services (https://www.findlaw.com/forms.html)

LEGAL RESEARCH

Learn About the Law (https://www.findlaw.com/law.html)

State Laws (https://www.findlaw.com/state.html)

U.S. Caselaw (https://caselaw.findlaw.com/)

U.S. Codes (https://codes.findlaw.com/)

**LEGAL NETWORK**

**FindLaw.com
(https://www.findlaw.com/)** Free, trusted legal information for consumers and legal professionals

**SuperLawyers.com
(https://www.superlawyers.com/)** Directory of U.S. attorneys with the exclusive Super Lawyers rating

**Abogado.com
(https://www.abogado.com/)** The #1 Spanish-language legal website for consumers

**LawInfo.com
(https://www.lawinfo.com/)** Nationwide attorney directory and legal consumer resources

Copyright © 2023, Thomson Reuters. All rights reserved.
Terms (https://www.findlaw.com/company/findlaw-terms-of-service.html) | Privacy (https://www.findlaw.com/company/privacy/privacy-statement.html)
| Disclaimer (https://www.findlaw.com/company/disclaimer.html) | Cookies (https://www.thomsonreuters.com/en/privacy-statement.html#cookies)
| Do Not Sell My Information (https://privacyportal-cdn.onetrust.com/dsarwebform/dbf5ae8a-0a6a-4f4b-b527-7f94d0de6bbc/5dc91c0f-f1b7-4b6e-9d42-76043adaf72d.html)